# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Carl Eller, Priest Holmes, Obafemi
Ayanbadejo, and Ryan Collins,
individually, and on behalf of all others
similarly situated,

Civil Action No: 0:11-cv-00748-RHK-JSM

Plaintiffs,

v.

National Football League, Arizona
Cardinals, Inc., Atlanta Falcons Football
Club LLC, Baltimore Ravens Limited
Partnership, Buffalo Bills, Inc., Panthers
Football LLC, Chicago Bears Football
Club, Inc., Cincinnati Bengals, Inc.,
Cleveland Browns LLC, Dallas Cowboys
Football Club, Ltd., Denver Broncos
Football Club, Detroit Lions, Inc., Green
Bay Packers, Inc., Houston NFL Holdings
LP, Indianapolis Colts, Inc., Jacksonville
Jaguars Ltd., Kansas City Chiefs Football
Club, Inc., Miami Dolphins, Ltd.,
Minnesota Vikings Football Club LLC,
New England Patriots, LP, New Orleans
Louisiana Saints, LLC, New York Football
Giants, Inc., New York Jets Football Club,
Inc., Oakland Raiders LP, Philadelphia
Eagles Football Club, Inc., Pittsburgh
Steelers Sports, Inc., San Diego Chargers
Football Co., San Francisco Forty Niners
Ltd., Football Northwest LLC, The Rams
Football Co. LLC, Buccaneers Limited
Partnership, Tennessee Football, Inc.,
Washington Football Inc.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION

Defendants.

## **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL SUMMARY ............................................................................ 1

III. ARGUMENT. .......................................................................................... 6

   A.   Plaintiffs Have Satisfied The Standard For A Preliminary Injunction. ................ 6

   B.   The NFL's Defenses Lack Merit. ..................................................... 12

IV.  CONCLUSION ...................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Needle, Inc. v. NFL,*
   130 S.Ct. 2201 (2010) ............................................................................. 8, 20

*Brown v. Pro Football, Inc.,*
   518 U.S. 231 (1996) ...................................................................... 16, 18, 19

*Cargill, Inc. v. Monfort of Colo.,*
   479 U.S. 104 (1986) ...................................................................................... 3

*Dataphase Sys., Inc. V. CL Sys., Inc.,*
   640 F.2d 109 (8th Cir. 1981) ............................................................. passim

*Jackson v. NFL,*
   802 F.Supp. 226 (D. Minn. 1992) ...................................................... passim

*Mackey v. NFL,*
   543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801 (1977) ...................... 9, 15

*McNeil v. NFL,*
   790 F.Supp. 871 (D. Minn. 1992) ......................................................... 9, 18

*McNeil v. NFL,*
   No. 4-90-476, 1992 WL 315292 (D. Minn. Sept. 10, 1992) ...................... 10

*NFLPA v. NFL,*
   598 F.Supp.2d 971 (D. Minn. 2008) .................................................. passim

*Powell v. National Football League,*
   764 F.Supp. 1351 (D.Minn.1991) ...................................................... 17, 18

*Powell v. NFL,*
   678 F.Supp. 777 (D. Minn. 1988), *rev'd*, 930 F.2d 1293 (8th Cir. 1989), *cert.*
   *denied*, 498 U.S. 1040 (1991) ........................................................... 16, 17

*Powell v. NFL,*
   690 F.Supp. 812 (D. Minn. 1988) ...................................................... 16, 18

*Reynolds v. NFL,*
   584 F.2d 280 (8th Cir. 1978) ..................................................................... 20

*Smith v. Pro-Football*,
    420 F. Supp. 738 (D.D.C. 1976), *aff'd in part and rev'd in part on other
    grounds*, 593 F.2d 1173 (D.C. Cir. 1978) ................................................................ 10

*United States Football League v. NFL*,
    644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) .................. 9

*West Pub. Co. v. Mead Data Cent., Inc.*,
    799 F.2d 1219 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987) ............................ 6

*White v. NFL*,
    585 F.3d 1129 (8th Cir. 2009) ...................................................................................... 3

*White v. NFL*,
    No. 4-92-906 (DSD), 2011 WL 706319 (D. Minn. March 1, 2011) ........................ 3, 4

## STATUTES

15 U.S.C. §2 ......................................................................................................................... 8, 9

15 U.S.C. §26 ........................................................................................................................... 2

29 U.S.C. §§101-15 ................................................................................................................ 12

29 U.S.C. §107 ....................................................................................................................... 15

29 U.S.C. §109 ....................................................................................................................... 12

## I.     <u>INTRODUCTION</u>

Plaintiffs Carl Eller, Priest Holmes, Obafemi Ayanbadejo, and Ryan Collins hereby move for a preliminary injunction restraining the National Football League ("NFL" or "league") and its member clubs from continuing a lockout that threatens to cancel the 2011 NFL playing season. The lockout was commenced on March 12, 2011 and has the undisputed effects that if, continued, will result in the cancellation of the 2011 NFL season. That cancellation will have direct effects on the retired and rookie members of the putative class sought to be represented by Plaintiffs here, as well as active NFL players.

Plaintiffs' motion is consistent with a motion for preliminary injunction against the NFL lockout filed by ten active NFL players and one prospective NFL player. *See* "Memorandum Of Law In Support Of Plaintiffs' Motion For Preliminary Injunction" (March 11, 2011) (Dkt. No. 4) in *Brady v. NFL*, No. 0:11-cv-00639-SRN-JJG (D. Minn.) ("*Brady*"). This motion is due to be heard on April 6, 2011. "Order" (March 14, 2011) (*Brady* Dkt. No. 33). Plaintiffs here ask that their motion be combined with the one pending in *Brady* and heard at the same time.

## II.    <u>FACTUAL SUMMARY.</u>

Plaintiffs represent a class composed of: (a) all retired or former professional football players who were employed by any NFL member but are not now employed by the NFL or any member club and who receive health, retirement or other benefits from the NFL pursuant to the "Bert Bell/Pete Rozelle NFL Player Retirement Plan" (the

"Plan") or other benefit plans subsidized by the NFL and (b) rookie professional football players who, as of March 11, 2011 to the date of final judgment in this action and the determination of any appeal therefrom, have not previously commenced negotiation with any NFL club concerning employment and have not been selected in any NFL College Draft. "Class Action Complaint" ¶20 ("Complaint").

The common thread binding these two groups is that neither has any employment relationship with the NFL or its member clubs. Rookies, as described above, have yet to enter into any such employment relationship. Former or retired NFL players, as described above, have ceased any such relationship. As also explained at paragraph 21 of the Complaint, none of the putative class members fall within the definition of the Collective Bargaining Unit ("CBU") contained in the 2006-12 Collective Bargaining Agreement ("CBA") between the NFL Management Council ("NFLMC") and the NFL Players Association ("NFLPA"), the union that formerly represented that CBU.  Affidavit of Mark J. Feinberg ("Feinberg Aff."), Ex. P.[1]

Nonetheless, all putative class members are alleged to be harmed irreparably by the lockout, either because they face potential termination or reduction of retirement or health benefits or because they confront a 2011 NFL College Draft process (slated to occur on April 28-30, 2011) that is a naked restraint of trade in violation of the antitrust laws. *See* Complaint, ¶¶42-49, 95-106. Plaintiffs and putative class members thus clearly have standing to pursue claims for injunctive relief under Section 16 of the Clayton Act

---

[1] All references to "Feinberg Aff." are to the Affidavit of Mark J. Feinberg filed in support of the Motion for Preliminary Injunction.

(15 U.S.C. §26). All that is required under that statute is that the alleged anticompetitive conduct creates a threat of injury, not that actual injury exists currently. *Cargill, Inc. v. Monfort of Colo*., 479 U.S. 104, 122 (1986).

The facts in this case are fundamentally not in dispute. The putative class described in the Complaint clearly exists and is excluded from the definition of the CBU contained in the 2006 CBA.

There is no dispute that the NFL and players entered into a Stipulation & Settlement Agreement ("SSA") on February 26, 1993 from which successive CBAs have been generated. *White v. NFL*, 585 F.3d 1129, 1133-34 (8th Cir. 2009); *White v. NFL*, No. 4-92-906 (DSD), 2011 WL 706319 at *1 (D. Minn. March 1, 2011) ("*White II*"). *See* Complaint, ¶¶ 40-41 and Feinberg Aff., Ex. A. There is no dispute that the NFLMC and NFLPA entered into the 2006 CBA as part of this process and that the league sought to terminate it early in 2011. *White II,* 2011 WL 706319 at *1. *See* Complaint, ¶41.  There is no dispute that NFL owners as early as 2008 were considering an eventual player lockout and took a series of steps to effectuate that goal. *See* Complaint, ¶¶ 49-74. There is no dispute that as part of these efforts, they negotiated broadcast contracts that gave them "lockout insurance"--guaranteed payments in the event an NFL season was cancelled in whole or in part. *White II,* 2011 WL 706319 at *2-*5. *See* Complaint, ¶¶ 51-59. There is no dispute that, as Judge David Doty held in *White II*:

> However, under the terms of the SSA, the NFL is not entitled to obtain leverage by renegotiating shared revenue contracts, during the SSA, to generate post-SSA leverage and revenue to advance its own interests and harm the interests of the Players. Here, the NFL renegotiated the broadcast contracts to

3

benefit its exclusive interest at the expense of, and contrary to, the joint interests of the NFL and the Players. This conduct constitutes "a design ... to seek an unconscionable advantage" and is inconsistent with good faith.

As an example of this bad faith, Judge Doty offered the following (2011 WL 706319 at *12 n.4 (citation omitted)):

> The NFL's "Decision Tree" is one glaring example of the NFL's intent and consideration of its own interests above the interests of the Players. Moving forward with a deal depended on the answer to the question: "Does Deal Completion Advance CBA Negotiating Dynamics?" If yes, the NFL should "Do Deal Now"; if no, the NFL should "Deal When Opportune."

This "Decision Tree" is attached as Exhibit B to the Complaint and the Feinberg Affidavit. Similar types of internal NFL documents are attached as Exhibits C-E. *See* Complaint, ¶58 and Feinberg Aff, Exs. C-E.

There is no dispute that after years of negotiation and the services of a federal mediator, the 2006 CBA expired on March 11, 2011. *Id.*, ¶¶76, 80-81.  See Exhibits F-K to the Complaint and Feinberg Aff., Exs, F-K.  The federal mediator, George Cohen ("Cohen"), had this to say in a press release dated March 11:

> [T]he parties have not achieved an overall agreement, nor have they been able to resolve the strongly held, competing positions that separated them on core issues.
>
> In these circumstances, having reviewed all of the events that have transpired, it is the considered judgment of myself and Deputy Director Scott Beckinbaugh, who has been engaged with me throughout this process, that no useful purpose would be served by requesting the parties to continue the mediation process at this time.

4

*Id.*, ¶81 & Exh. O to Complaint and Feinberg Aff., Ex. O. There is no dispute that on the same day, the NFLPA renounced its status as a union and has taken multiple affirmative steps to effectuate that renunciation. *Id.*, ¶¶82, 84-87. The letters of renunciation are attached as Exhibits L and M to the Complaint and the Feinberg Aff. There is also no dispute that on March 11, 2011, the NFLMC responded with a letter advising NFL players of a lockout commencing on March 12. *Id.*, ¶87.That letter is attached as Exhibit N to the Complaint and the Feinberg Aff.

There is no dispute that on April 28-30, 2011, the NFL plans to conduct the 2011 College Draft. *Id.*, ¶99. In past years, the draft was conducted with an "Entering Player Pool" ("EPP"). *Id.*, ¶47.

There is no dispute that the NFL subsidizes various health and retirement plans for retired or former NFL players, such as the Plan described above, the "88 Plan", the NFL Player Care Plan and others. *Id.*, ¶¶42-46. Contributions to these plans are directly jeopardized by the loss of revenue caused by a cancelled season. *Id.*, ¶104. If no new CBA is created within a year, the Plan itself could be terminated, by its own terms. *Id.*, ¶43. And the amounts contributed were affected by the terms in the CBA that has expired. *Id.*, ¶42.

The main factual disputes here are twofold: First, have the NFL and its member clubs engaged in an antitrust violation? Second, is that violation exempt with respect to this putative class because of the statutory or non-statutory labor antitrust exemptions. Plaintiffs anticipate that they will see raised against them the same arguments raised by the NFL in *Brady*:  whether the NFLPA's renunciation of its representative status was a

5

sham and hence whether any labor antitrust exemption can be applied? *See* "Memorandum of National Football League And Its Member Clubs In Opposition To Plaintiffs' Motion For A Preliminary Injunction," pp. 5-9 (March 21, 2011) (*Brady* Dkt. No.34) ("NFL Memo."), Plaintiffs here contend that: (a) the exemptions do not apply to the putative class here because none of them have any employment relationship with the NFL and were not within the CBU being represented by the NFLPA and (b) in any event, under the controlling caselaw, the renunciation must be given full effect.

## III.   **ARGUMENT.**

### A.  **Plaintiffs Have Satisfied The Standard For A Preliminary Injunction.**

Plaintiffs have satisfied the standard for a preliminary injunction. The court considers four factors when determining whether to issue either a preliminary injunction:

1. The probability that the movant will succeed on the merits of its claims;

2. The threat of irreparable harm to the movant if the requested relief is denied;

3. The balance between the harm to the movant if injunctive relief is denied and the injury that will result if such relief is granted; and

4. The public interest.

*Dataphase Sys., Inc. V. CL Sys., Inc*., 640 F.2d 109, 119 (8th Cir. 1981) ("*Dataphase*"). None of these factors is determinative. "[R]ather, in each case the four factors must be balanced toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc*., 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070

(1987); *Dataphase*, 640 F.2d at 113. The *Dataphase* factors have been applied in this district in two prior cases involving the NFL where preliminary injunctive relief or a temporary restraining order ("TRO") was granted: *Jackson v. NFL*, 802 F.Supp. 226 (D. Minn. 1992) ("*Jackson*") (issuing a TRO against enforcement of the league's Right of First Refusal/Compensation Rules (known as "Plan B")  rules limiting movement among teams) and *NFLPA v. NFL*, 598 F.Supp.2d 971 (D. Minn. 2008) ("*NFLPA*") (enjoining enforcement of arbitral awards decreeing four-game suspensions for use of banned substances).

The court in *Jackson* found a likelihood of success given prior rulings against the NFL. 802 F.Supp. at 229-30. It found irreparable injury "because [plaintiffs] suffer irreparable injury each week that they remain restricted under an illegal system of player restraints." *Id*. at 230-31. The balance of hardships tipped in plaintiffs' favor because "defendants have no justifiable interest in continuing to violate the Sherman Act by preserving an illegal *status quo*. In balancing any hardship to defendants against plaintiffs' harm if the requested relief is denied, the court finds that plaintiffs stand to suffer the greater harm and thus this factor favors injunctive relief." *Id*. at 232. And the public interest favored the granting of an injunction because such relief fosters the policies underlying the Sherman Act and does not undermine the policies of labor law." *Id*.

In *NFLPA*, the court found irreparable injury because the NFLPA raised a substantial issue as to whether they were tainted by bias. 598 F.Supp.2d at 982. Irreparable injury was found because "[a]s the NFLPA argues, a player who has been

suspended...is ineligible for post-season awards such as the Pro-Bowl. Those honors carry significant economic and non-economic benefits. Moreover, at least some of the players are central to their team's chances of making the playoffs. The failure to make the playoffs and the effect of that failure on the players, teams, and fans is not compensable monetarily and is therefore an irreparable harm."

*Id.* These factors also tipped the balance of equities in plaintiffs' favor. *Id*. at 983. Finally, the court found that because of "the strong public policy of deterring breaches of fiduciary duty, the public interest weighs in favor of an injunction here. Similarly, as courts have recognized for more than a century, the public interest lies in ensuring that innocent people are not subject to unjust punishment." *Id*.

Many of these considerations apply here.

1.     **Likelihood of success** is high in this case. The United States Supreme Court held last year in *American Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2212-13 (2010) ("*American Needle*") that each member team is legally capable of conspiring with other member teams in violation of the antitrust laws:

> The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousnesses," and "[t]heir objectives are" not "common." ... The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel.

Here, the NFL and its member clubs have agreed to engage in a group boycott—the lockout—in furtherance of their anticompetitive practices. Absent some immunity, this conduct is likely to be found to violate the antitrust laws.

The likelihood of success is also supported by the NFL's position as a recidivist antitrust violator. The NFL is an adjudicated monopolist that acquired its monopoly power in the market for professional football in violation of Section 2 of the Sherman Act (15 U.S.C. §2). Thus, in *United States Football League v. NFL*, 644 F. Supp. 1040, 1057-58 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) *("USFL")*, the court upheld jury determinations that: (a) the NFL held monopoly power in the professional football market, receiving 95% of the revenues from major league professional football and (b) it had acquired that power through "predatory conduct." These findings have been given collateral estoppel effect in subsequent antitrust cases against the NFL. *E.g., McNeil v. NFL*, 790 F.Supp. 871, 889-96 (D. Minn. 1992) ("*McNeil I*").

The NFL has also been determined to have abused its dominant position in the market for professional football services, which is the relevant market at issue in this case. For example, in *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801 (1977) ("*Mackey*"), the issue was the validity of the "Rozelle Rule," which decreed that when a football player's contract with an NFL club expired and he moved to a different club, his present employer had to provide compensation to his former employer, with the NFL Commissioner resolving any dispute. The United States Court of Appeals for the Eighth Circuit upheld the district court's determination of liability after a 55-day trial. The appellate court found that the relevant market was one for professional

football services (*id*. at 617-18) and that the "Rozelle Rule, as enforced, unreasonably restrains trade in violation of §1 of the Sherman Act" (*id*. at 622).

Likewise, it has been determined that the NFL's College Draft "cannot be regarded as 'reasonable' under the antitrust laws." *Smith v. Pro-Football*, 420 F. Supp. 738, 747 (D.D.C. 1976), *aff'd in part and rev'd in part on other grounds*, 593 F.2d 1173 (D.C. Cir. 1978).

Similarly, after a ten-week trial, a jury in another case held that the NFL's conspiratorial "Plan B" rules that limited the mobility of professional football players after their contracts expired and they became "free agents" had a "a substantially harmful effect on competition in the relevant market for the services of professional football players." *McNeil v. NFL*, No. 4-90-476, 1992 WL 315292 at *1 (D. Minn. Sept. 10, 1992) ("*McNeil II*").

In 1992, a group of players brought suit seeking relief for injuries they suffered as a result of the very same anticompetitive restraints that the jury in *McNeil II* found violated Section 1 of the Sherman Act. As noted above, in *Jackson*, the district court gave collateral estoppel effect to the jury's findings. *Id*. at 802 F.Supp. at 229-30. It then issued a temporary restraining order against the enforcement of the rules. *Id*. at 230-31.

**Irreparable injury** is also present. Retirees and other former NFL players who receive retirement and health benefits (*see* 2007 Bert Bell/Pete Rozelle NFL Player Retirement Plan, Feinberg Aff., Ex. Q) are innocent victims of the NFL lockout. As the Complaint alleges (Complaint, ¶¶93-94, 103), the average career of an NFL player is short and they can suffer devastating injuries or long term effects (such as the "dementia"

that Plan 88 is directed against) that shorten their lives and greatly impact the quality of those lives. Often, their only hope of survival is through benefits received from the league. Any cessation or reduction of those benefits caused by a lockout is an injury that is life-threatening for many putative class members and hence is truly irreparable. This is the type of "unjust punishment" that the court in *NFLPA* decried.

Likewise, rookies who are denied the right to play in all or part of the 2011 NFL season will suffer irreparable injury. *Id.*, ¶105. If they don't play because of the lockout, their careers are shortened and they may be in the unenviable position of competing for slots on NFL clubs against the rookie contingent available during the year that play resumes. They are also denied honors that may enhance their careers. And they are put at a greater risk of injury when they do return because of not having played for months or perhaps years.

And the NFL fans' potential loss of all or part of the 2011 NFL season is also an injury for which money is no compensation. *Id.*, ¶106.

The **balance of hardships** tips in favor of Plaintiffs and putative class members, given that the lockout is a naked restraint of trade in furtherance of other restraints of trade. And when one compares the vast wealth of, and receipts received by, NFL club owners, it cannot be denied that players (including rookies and former players) will bear the brunt of any hardship. *Id.*, ¶¶30-35, 92-94.

The **public interest** is best served by enjoining antitrust violations. And the public interest is best served by having a 2011 NFL season go forward, so that the many millions of fans of NFL football are not unfairly disadvantaged.

### B.   The NFL's Defenses Lack Merit.

The NFL's counterarguments against injunctive relief made in the *Brady* case do not compel a contrary result with respect to the present motion. The league argues that: (a) the statutory labor antitrust exemption of the Norris-La Guardia Act (29 U.S.C. §§101-15) ("Norris-La Guardia") bars injunctive relief here (NFL Memo., pp. 9-16); (b) the nonstatutory labor antitrust exemption and principles of primary jurisdiction (alleged to arise from fact that the NFL has filed an unfair labor charge against the NFLPA) require this Court to stay any injunction directed at the league's lockout until the agency makes a ruling (*id.*, pp. 17-27); and (c) the various *Dataphase* factors operate in the league's favor (*id.*, pp. 28-48). None of these arguments have merit.

**Statutory labor antitrust exemption**. The NFL's discussion of the statutory labor antitrust exemption in its brief in *Brady* characterizes that case as part of a "dispute with their [NFL clubs'] employees over terms and conditions of their employment." NFL Memo., p. 12. On its face, that is not what this case is about. The former NFL players defined to be part of the putative class no longer have an employment relationship with the NFL or any of its member clubs, The rookies defined to be part of this class have never had any such relationship. Buy its terms, Norris-LaGuardia applies to disputes "between one or more employers or associations of employers and one or more employees or associations of employees." 29 U.S.C. §109. That is simply not this case.

Even if one were to assume the contrary, as noted above, on March 11, 2011, the NFLPA renounced its representative status. In *Jackson*, the court denied the applicability

of Norris-La Guardia after a similar renunciation by the NLPA, explaining its persuasive

reasoning at length:

> Defendants also contend that the Norris-LaGuardia Act, 29 U.S.C. §§ 101-15, bars any injunctive relief in the present case. That Act limits federal courts' jurisdiction to issue injunctive relief in cases "involving or growing out of a labor dispute" and specifically prohibits any injunctive relief "contrary to the public policy declared" in the Act. 29 U.S.C. § 101. The Act defines public policy in "labor matters" as follows:

> Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

> Id. § 102. Thus, the Act seeks to protect:

> the rights of employees to organize into unions and to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection.'

> *Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 805... (1945) (quoting Act). Based on the court's determination in *McNeil* that any bargaining relationship between players and defendants ended no later than November, 1989, *Powell and McNeil v. National*

*Football League*, 764 F.Supp. 1351, 1358-59 (D.Minn.1991) (holding only in *McNeil*) and that the Plan B rules were thereafter subject to antitrust challenge, *id*. at 1359, the court determines that the Act does not preclude injunctive relief in the present case because such relief will not undermine any labor policy set forth in the Act. *See Los Angeles Meat & Provision Drivers Union, Local 626 v. United States,* 371 U.S. 94, 99-102... (1962) (Norris-LaGuardia Act does not prohibit injunctive relief where labor union conspires with employer to violate the Sherman Act because such an illegal combination to restrain competition does not grow out of a labor dispute); *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 880 (S.D.N.Y.1975) (rejecting as "patently meritless" argument that Norris-LaGuardia Act should be used to dissolve injunction that prevented the merger of two rival professional basketball leagues because Act "did not apply to an antitrust case"); *Nassau Sports v. Peters*, 352 F.Supp. 870, 882 (E.D.N.Y.1972) (Act did not apply to dispute between hockey player and hockey club because player's contract was one for "unique personal services to be rendered by an individual", and thus did not involve either a labor dispute or labor contract); *Flood v. Kuhn*, 316 F.Supp. 271, 280 n. 15 (S.D.N.Y.1970) (Act did not apply to action by baseball player challenging professional baseball's reserve system); *cf. Mackey,* 543 F.2d at 623 (upholding permanent injunctive relief based on determination that Rozelle Rule violated the Rule of Reason, and stating that it was unclear whether case presented a labor dispute as defined by the Act).

Denying injunctive relief in the present case may actually subvert the labor policies set forth in the Act. As the court previously stated, the players sacrificed their union representation and the protection of the labor laws to pursue their antitrust remedies. *Powell and McNeil*, 764 F.Supp. at 1355-59 (decision in *McNeil* ). It would be ironic if a statute that had been enacted to protect the rights of individual employees from improper actions by employers and the courts were turned against those employees and used to justify the continued application of a system found illegal under the Sherman Act. *Cf. United States v. Women's Sportswear Mfg. Ass'n,* 336 U.S. 460, 464... (1949) (reversing denial of government's request for antitrust injunctive relief involving activities of unincorporated trade association

> because "benefits to organized labor cannot be utilized as a
> cat's-paw to pull employers' chestnuts out of the antitrust
> fires").

*Jackson*, 802 F.Supp. at 232-34 (footnotes omitted).

Here, as well, the NFLPA's renunciation of representative status renders Norris-La Guardia's statutory labor antitrust exemption inapplicable because no "labor policy" is being challenged. Here, as in *Mackey* and the other cases cited in the quotation, there is a real issue as to whether the present dispute can be characterized as a "labor dispute," any more than could the antitrust viability of the Rozelle rule in *Mackey*. And Norris-LaGuardia certainly does not immunize a lockout accomplished in part by the league obtaining "lockout insurance" in bad faith by conspiring and contracting with non-labor entities such as broadcasters.

In addition, 29 U.S.C. §107, which is part of Norris-La Guardia, *does* permit a district court to issue injunctions relating to labor disputes if is shown that: (1) illegal acts either have been committed or are threatened to be committed; (2) the movant will suffer irreparable harm; (3) the balance of harms weighs in favor of the movant; (4) there is no adequate remedy at law; and (5) "the public officers charged with the duty to protect [movant's] property are unable or unwilling to furnish adequate protection." In *NFLPA*, the district court held that, except for the fifth factor (which it deemed inapplicable and is inapplicable here as well), these considerations "echo[ed]" the *Dataphase* factors; "the Court finds that, should the NFLPA succeed in establishing the Dataphase factors listed above, preliminary injunctive relief is appropriate." 598 F.Supp.2d at 978.

The NFL cites many cases with respect to its Norris-LaGuardia argument, but only two involve the league: *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) ("*Brown*") and *Powell v. NFL*, 690 F.Supp. 812 (D. Minn. 1988) ("*Powell II*"). As the Supreme Court stated in *Brown*, it was concerned with the *nonstatutory* labor antitrust exemption, not the statutory labor one created in Norris-LaGuardia. 518 U.S. at 235-36. And in *Powell II*, the court did not want to undermine what it viewed as an ongoing collective bargaining process. 690 F.Supp. at 817. Here, of course, collective bargaining ended on March 11, 2011.

**Nonstatutory labor antitrust exemption/primary jurisdiction**. The NFL's argument that, pursuant to the nonstatutory labor antitrust exemption and principles of primary jurisdiction, this Court should hold antitrust actions seeking to enjoin the league's lockout in abeyance based on the primary jurisdiction of the NLRB is equally unfounded.

To begin with, since the nonstatutory labor antitrust exemption arises from the collective bargaining relationship (*Brown*, 518 U.S. at 235-36), it should have no application to this case, where no member of the putative class is part of the CBU that was negotiating with the NFL.

In addition, the cases on which the league relies that has arisen in the context of NFL disputes is *Powell v. NFL*, 678 F.Supp. 777 (D. Minn. 1988), *rev'd*, 930 F.2d 1293 (8th Cir. 1989), *cert. denied*, 498 U.S. 1040 (1991) ("*Powell I*") and *Brown*. *Powell I* is distinguishable and the NFL fails to consider what happened subsequent to that decision. The district court in *Powell I* noted that there is a duty to continue bargaining until an

"impasse" is reached. Because it viewed a finding of good faith as a precondition to determining if an impasse exists, it applied the nonstatutory labor antitrust exemption and decided to await the resolution of an unfair labor charge brought before the NLRB by the NFL. Certainly, the Cohen statement quoted above provides a basis for determining an "impasse" here. However, on appeal in *Powell I*, the Eighth Circuit ruled that use of an "impasse" standard focused on a point too early in the discussions between employers and employees.  930 F.2d at 1302.  It declined to identify when a proper juncture would occur, but said:

> Upon the facts currently presented by this case, we are not compelled to look into the future and pick a termination point for the labor exemption. The parties are now faced with several choices. They may bargain further, which we would strongly urge that they do. They may resort to economic force. And finally, if appropriate issues arise, they may present claims to the National Labor Relations Board. We are satisfied that as long as there is a possibility that proceedings may be commenced before the Board, or until final resolution of Board proceedings and appeals therefrom, the labor relationship continues and the labor exemption applies.

*Id*. at 1303-04.

The case was remanded to the district court and, in the interim, the NFLPA, as here, renounced its representative status. *Powell v. NFL*, 764 F.Supp. 1351, 1356 (D. Minn. 1991) ("*Powell III*"). The district court held that this action nullified any nonstatutory labor antitrust exemption:

> Based on the foregoing, the court holds that the plaintiffs are no longer part of an "ongoing collective bargaining relationship" with the defendants. The NFLPA no longer engages in collective bargaining and has also refused every overture by the NFL defendants to bargain since November of

17

1989. The NFLPA further has abandoned its role in all grievance arbitrations and has ceased to regulate agents, leaving them free to represent individual players without NFLPA approval. The plaintiffs have also paid a price for the loss of their collective bargaining representative because the NFL defendants have unilaterally changed insurance benefits and lengthened the season without notifying the NFLPA.

Because no "ongoing collective bargaining relationship" exists, the court determines that nonstatutory labor exemption has ended. In the absence of continued union representation, the Eighth Circuit's rationale for the exemption no longer applies because the parties may not invoke any remedy under the labor laws, whether it be collective bargaining, instituting an NLRB proceeding for failure to bargain in good faith or resorting to a strike.

*Id*. at 1358-59. *Accord McNeil I*, 790 F.Supp. at 883-84.[2]

The NFL argued that this unilateral renunciation was insufficient and said that the district court was required to wait for the NLRB to rule on the validity of the decertification. The district court rejected that argument, stating that:

Just as certification is not required to create a collective bargaining relationship, a decertification proceeding is not required to end it. ...  In the present case, a majority of players have voted to end collective bargaining. The NFLPA also concedes that it has lost its majority status and may no longer bargain on the players' behalf. Thus, there is no need for the NLRB to decertify the NFLPA.

764 F. Supp. at 1358.

Based on *Powell III*, this Court is not barred from acting until the NLRB issues some ruling. This principle should apply with special force in this case, where the

---

[2] Interestingly, the district court in *Powell II* noted that the NLRB "dismissed the owners' charge of bad faith bargaining" by the NFLPA. 690 F. Supp. at 814.

putative class consists of persons excluded from the CBU contained in the 2006 CBA, over whose claims the NLRB would have no jurisdiction.

The NFL further argues that the nonstatutory labor antitrust exemption applies to its lockout in light of the United States Supreme Court's 1996 decision in *Brown,* where the Court also expressed some deference to having an NLRB determination. This argument is unavailing. *Brown* did not involve the NFLPA's renunciation of its union status, however. There, collective bargaining over developmental squad salaries reached an impasse and the NFL club owners unilaterally implemented their plan. 518 U.S. at 234-35. The Supreme Court ruled that this conduct was protected by the nonstatutory labor antitrust exemption, but carefully distinguished that conduct from the type of situation present here:

> For these reasons, we hold that the implicit ("nonstatutory") antitrust exemption applies to the employer conduct at issue here. That conduct took place during and immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship.
>
> Our holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process. *See, e.g.*, [*Brown v. Pro Football, Inc.*,] 50 F.3d, [1041] at 1057 [(D.C. Cir. 1995)](suggesting that exemption lasts until collapse of the collective-bargaining relationship, as evidenced by decertification of the union)

518 U.S. at 249. Here, the union has, in effect, decertified itself and the collective bargaining relationship has collapsed. And here, the league's conduct does not concern only parties to the collective bargaining relationship.

*Dataphase* **factors**.  In *Brady*, the NFL also contends that the various *Dataphase* factors cannot be satisfied. The decisions in *Powell III* and *Brown* refute the NFL's claim that a preliminary injunction cannot be granted against the lockout because success on the merits is not likely in light of the nonstatutory labor antitrust exemption. The decisions in *Jackson* and *NFLPA* defeat the NFL's contention that irreparable injury cannot be found. The NFL does contend that the balance of hardships tips in its favor because the Eighth Circuit in *Reynolds v. NFL*, 584 F.2d 280, 287 (8th Cir. 1978), in approving a settlement class, said that "[p]recise and detailed rules must of necessity govern how the sport is played, the rules of the game, and the acquisition, number, and engagement of players." There are two answers to this contention. First, the lockout is not about "precise and detailed" rules of play; it is designed to prevent play from occurring. Second, in light of the United States Supreme Court's ruling in *American Needle,* collusive "precise and detailed" rules of play that are anticompetitive will not be countenanced. Finally, in discussing the public interest in factor in *Dataphase*, the NFL asserts that the public has an interest in supporting national labor policy. However, as reflected in the decision in *American Needle*, the public also has an interest in having the antitrust laws properly enforced.

IV.    **CONCLUSION**

For all of the foregoing reasons, the request for preliminary injunctive relief should be granted.

Dated:   March 30, 2011                    Respectfully Submitted,

/s/Mark J. Feinberg
Mark J. Feinberg (#28654)

Michael D. Hausfeld              Michael E. Jacobs (#0309552)
Hilary K. Scherrer               Shawn D. Stuckey (#0388976)
HAUSFELD LLP                     ZELLE HOFMANN VOELBEL & MASON, LLP
1700 K Street, NW                500 Washington Avenue, South
Suite 650                        Suite 4000
Washington, D.C. 20006           Minneapolis, MN 55415
Telephone: (202) 540-7200        Telephone: (612) 339-2020
Facsimile: (202) 540-7201        Facsimile: (612) 336-9100
mhausfeld@hausfledllp.com        mfeinberg@zelle.com
hscherrer@hausfeldllp.com        mjacobs@zelle.com
                                 sstuckey@zelle.com

Michael P. Lehmann
Jon T. King                      Daniel S. Mason
Arthur N. Bailey, Jr.            ZELLE HOFMANN VOELBEL & MASON, LLP
HAUSFELD LLP                     44 Montgomery Street
44 Montgomery Street             Suite 3400
San Francisco, CA 94111          San Francisco, CA 94104
Telephone: (415) 633-1908        Telephone: (415) 633-0700
Facsimile: (415) 358-4980        Facsimile: (415) 693-0770
mlehmann@hausfeldllp.com         damson@zelle.com
jking@hausfeldllp.com
abailey@hausfeldllp.com
                                 Samuel D. Heins (#43576)
                                 Vince J. Esades (#249361)
                                 HEINS MILLS & OLSON, P.L.C.
                                 310 Clifton Avenue
                                 Minneapolis, MN 55403
                                 Telephone: (612) 338-4605
                                 Facsimile: (612)338-4692
                                 sheins@heinsmills.com
                                 vesades@heinsmills.com

                                 *Attorneys for Plaintiffs*